U.S. DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

LEWIS MASOTTI and,
JUDITH E. MASOTTI,

    Plaintiffs,

vs.

ROYAL CARIBBEAN CRUISES, LTD. and

    Defendants.
_____/

## **COMPLAINT FOR DAMAGES**

Plaintiffs, **LEWIS MASOTTI** and **JUDITH E. MASOTTI**, by and through their undersigned counsel, hereby sue the Defendant, **ROYAL CARIBBEAN CRUISES, LTD**, alleges as follows:

## **PARTIES**

1. Plaintiff, **LEWIS MASOTTI**, was and is a resident of and domiciled in the State of Florida, and resides in Royal Palm Beach, Palm Beach County, Florida.

2. Plaintiff, **JUDITH E. MASOTTI**, was and is a resident of and domiciled in the State of Florida, and resides in Royal Palm Beach, Palm Beach County, Florida.

3. At all times material, Defendant, **ROYAL CARIBBEAN CRUISES, LTD** ("RCCL") was and is incorporated in the State of Florida and maintains its principal place of business in the State of Florida, located at: 1080 Caribbean Way, Miami, Florida 33132.

4. At all times material, **DR. MICHAEL ESTEBETH**, a foreign citizen, was an employee or agent of the Defendant, RCCL, as its ship's physician and was at all times material acting within the scope and course of his employment or agency with RCCL.

## JURISDICTION AND VENUE

5. This is an action for damages that exceeds this Court's minimum jurisdictional requirements, to wit, $75,000.00, exclusive of all interest and costs.

6. This Court has jurisdiction over this matter pursuant to 28 USC §1333(1) (admiralty) and the contractual language contained in the cruise ticket.

7. Venue in the United States District Court for Southern District of Florida is appropriate pursuant to the forum selection clause contained in the passenger ticket between Plaintiff and Defendant.

8. At all times material, Defendant, **ROYAL CARIBBEAN CRUISES, LTD** (hereinafter "Defendant") personally or through an agent:

    A. Operated, conducted, engaged and/or carried on a business venture in the State of Florida, and in particular Miami-Dade County, Florida;

    B. Maintained its principal place of business in Miami-Dade County, Florida;

    C. Was engaged in substantial business activity in the State of Florida, and in particular, in Miami-Dade County, Florida;

    D. Operated vessels and provided vessels for cruises in the waters of this state;

    E. Committed one or more acts as set forth in F.S. §§ 48.081, 48.181 and 48.193, which submit Defendant to the jurisdiction and venue of this Court. Further, Defendant is subject to the jurisdiction of the Court due to the foregoing and 28 U.S.C. § 1333;

    F. The acts of Defendant set out in the Complaint occurred in whole or in part in Miami-Dade County and/or the State of Florida.

9. All conditions precedent to the institution of this action have been satisfied, or otherwise excused, including the pre-suit notice required by the terms and conditions of Defendant's

cruise ticket. (See notice letter attached as Exhibit "A"). (The ticket is no longer in Plaintiff's possession).

## GENERAL ALLEGATIONS

10. On or about May 23, 2018, the Plaintiffs, **LEWIS MASOTTI** and **JUDITH E. MASOTTI**, were lawfully and legally aboard the Royal Caribbean *Harmony of the Seas* as an invitee and paying passenger with the actual and/or constructive consent of Defendant, **ROYAL CARIBBEAN CRUISES, LTD**.

11. On or about May 23, 2018, the Defendant owned and operated a passenger cruise ship known as the *Harmony of the Seas*, such vessel being used as a passenger cruise vessel.

12. On May 23, 2018 at 9:28 a.m., Plaintiff, **LEWIS MASOTTI**, presented himself to the ships Medical Center for assistance in self-catheterization. Dr. Michael Etsebeth, at the medical center on board the Harmony of the Seas, attempted to assist Mr. Masotti with self-catheterization.

13. During this initial visit to the Medical Center, Mr. Masotti was also seen by the intake nurse Sheila Moral Buendia, who took vital signs, all normal and characterized his condition as nonurgent.

14. By 10:21 a.m. Dr. Etsebeth inserted the catheter, and believing it was properly inserted, discharged Mr. Masotti back to his state room. Dr. Etsbeth noted in medical records that he "passed Folly's (sp) 14g indwelling with bag till this afternoon."

15. The next chart entry, at 6:28 p.m., describes Mr. Masotti returning to the medical center at 1600 H (4:00 p.m.) noting "output in urine is blood". Mr. Masotti was given IV access stat

and blood sample for testing was taken. Vital signs at 4:05 p.m. showed an elevated heart rate (82 BPM), reduced blood pressure (96/55), and a reduced mean arterial pressure (68).

16. No further vital signs were noted until 6:58 a.m. the next morning.

17. At that time, Nurse Adlin Bowie describes the previous night's history stating "guests called nurse on duty, stating that she needs her husband to be seen by the doctor, was taken from the room by Bell attendant. Upon arrival to the medical facility, states that his mouth is very dry, but does not have pain just feeling weak. In the urinal bag is 300mm hematuria."

18. Vital signs now show blood pressure at 110/50 (extremely low diastolic pressure), heart rate of 87 bpm, mean arterial pressure of 70, and respiratory rate of 20 breaths per minute. The next vital signs at 9:07 a.m. reflect a worsening health condition with blood pressure now that 90/51, mean arterial pressure 64 heart rate of 98 bpm, and an elevated body temperature (99.7 F). Repeat vital signs continue to objectively reflect Mr. Masotti's deteriorating condition with the blood pressure of 97/47 at 9:45 a.m..

19. At 11:23 a.m. Mr. Masotti's blood pressure is still dangerously low (90/54) and mean arterial pressure of 66. He is not improving and it is clear that he is bleeding internally. Yet Dr. Etsbeth fails to recognize this, despite the passage of over 24 hours since initial presentation.

20. Blood test results confirm Mr. Masotti's deteriorating condition; his blood glucose levels are 64; his urea nitrogen levels are 64 on a scale of 7 to 22 mg/dL; his C-reactive protein is elevated 200 on a scale of 0 to 7.5 mg/L; CBCs show granulocytes elevated at 9.6 on a scale of 1.8 to 7.2; lymphocytes below normal at 0.8 on a scale of 1.7 to 4.9; and, platelets

below normal at 119 on a scale of 142 to 440. i-Stat Chem8 testing showed elevated creatinine, elevated anion gap, and decreased TCO. An electrocardiogram was taken, but no notes reflect the results and the findings are left blank.

21. Finally, on May 24, 2018 between 11:08 a.m. and 11:17 a.m., numerous procedures are instituted, including an EKG, norepinephrine is added to saline fusion "due to documented extremely low blood pressure of 84/48 and ceftriaxone 2g and levoflozacin are administered for the first time by IV. At 11:11 a.m. Dr. Etsebeth first notes **"patient in septic shock and hypertensive"**. Shipboard announcements are made for blood donors. Due to Mr. Masotti's emergency situation, and for the first time Dr. Estebeth notes "telephonic discussion with on-call international 30 minutes ago," and considers for the first time a transfer to CostaMed (in Cozumel, Mexico) and evacuation by air ambulance. However, it was determined that Mr. Masotti's condition was too critical (heartbeat dropping alarmingly) and he needed a blood transfusion immediately.

22. Mr. Masotti was ultimately medically disembarked, after the *Harmony* of the Seas docked in Cozumel, Mexico, where he was transferred to Cozumel Medical Center. He was diagnosed with hematuria, unable to stand, dehydrated, and suffering from urosepsis, a urinary tract infection, and blood clots were found to be draining from the urinary catheter. A high white and low red blood cell count indicated internal bleeding; high levels of reactive protein (271 on a scale of 0 to 6 mg/L, low lymphocytes 4% in a scale of 25% to 45% indicated signs of infection, severe dehydration, and malnutrition. Extremely high creatinine levels 3.2 on a scale of 0.5 to 2.5 mg/dL showed signs of kidney function impairment and potential failure.

23. Comparing the bloodwork from the ship to Cozumel Medical Center reflects the reality of a significantly deteriorating patient who was allowed to remain on the ship for three days from presentation with clear signs of sepsis, dehydration and internal bleeding.

24. By the time Mr. Masaki returned home to South Florida, he was admitted to various hospitals and rehabilitation centers where he was found to be in a confused state, showing evidence of frontal release signs, dementia, and encephalopathy secondary to urinary tract infection with progressive kidney failure, lower extremity weakness, and inability to bear weight.

25. During his stay at Palms West Hospital for rehabilitative care, Mr. Masotti was noted to have mild aphasia (word finding fluency) and was found to be mildly obtunded- a clear sign of cognitive deficit.

26. Over the course of the next several months, Mr. Masotti continue to treat with his primary care physician and urologist, Dr. Ross Cohen. He required numerous bladder interrogations, was found to have chronic pyuria (white blood cells and pus in the urine), and penile erosion.

27. By November 2018, medical records note that Mr. Masotti is complaining of problems with cognition, noticing difficulty remembering the day of the week, the inability to balance his checkbook, or get out his words.

28. In January 2019, Mr. Masotti was diagnosed with major neurocognitive disorder, and adjustment disorder with depressed mood from complications of sepsis.

29. As a result of this incident, Mr. Masotti has been seriously and permanently affected physically, psychologically and cognitively.  His ability to assist himself with daily living

tasks is severely affected, he has lost his independence, and he requires daily assistance by his wife, Judy Masotti, with cleaning and maintenance of his now permanent suprapubic catheter, which is at high risk for infection. Mr. Masotti now has a draining urine bag 24 hours, 7 days a week. He must replace the leg bag before bed with another bag that is 2-3 times the size to capture night urination. This must be dumped and replaced every morning. He takes the leg bag with him everywhere he goes and is limited in traveling due to the rigors of the night bag and cleaning routine. He requires flushing every two days as the urine bag backs up and develops mucus.

30. Mrs. Masotti is now required to provide extensive and rigorous daily care and suprapubic catheter management, cleaning, and care. Mr. and Mrs. Masotti's intimate relations have been shattered, and their once active lifestyle including golfing, traveling, and enjoying the fruits of the successful and productive life has been taken away.

31. The Plaintiffs, **LEWIS MASOTTI** and **JUDITH E. MASOTTI**, have been married for over 31 years. Up until the time of this incident, Mr. & Mrs. Masotti lived an active life- physically, socially, and intimately.

## **COUNT 1 – NEGLIGENT MEDICAL CARE AND TREATMENT VIA EMPLOYEES OR ACTUAL AGENTS**

32. Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs 1 through 31 as though originally stated herein.

33. The Defendant owed a duty to the Plaintiff, **LEWIS MASOTTI**, to provide prompt and appropriate medical care upon his presentation to the ship's infirmary on May 23, 2018.

34. The Defendant, RCCL, by and through the acts of its employees or agents, including medical personnel, was negligent, in one or more of the following ways:

    A.     In failing to properly assess the condition of LEWIS MASOTTI;

    B.     In failing to timely diagnose and appropriately treat LEWIS MASOTTI;

    C.     In failing to order appropriate diagnostic tests to further assess the degree of injury;

    D.     In failing to recognize and understand the significance of diagnostic testing, vital signs and blood chemistry results and to appreciate LEWIS MASOTTI's rapidly declining medical condition;

    E.     In failing to obtain consultations with appropriate specialists;

    F.     In failing to recognize signs of internal bleeding, infection, dehydration and to treat these conditions within the appropriate standard of care;

    G.     In failing to properly monitor the patient;

    H.     In failing to evacuate the patient from the vessel for further care in a timely manner;

    I.     In deviating from the standard of care for patients in LEWIS MASOTTI's circumstances.

35. The Defendant, RCCL, acknowledged through its hiring and holding out of its medical personnel, including **DR. MICHAEL ESTEBETH**, and all nurses, that they acted for RCCL; **DR. MICHAEL ESTEBETH** and the nurses manifested the acceptance of that undertaking by providing care to RCCL's passengers in RCCL's medical center, and RCCL controlled or had the right to control the medical personnel's actions, as more fully set forth *infra* and *supra*.

36. RCCL directly paid the medical personnel for their work in the ship's medical center.

37. The medical center was created, owned and operated by RCCL.

38. RCCL hired and had the right to fire its medical personnel, including DR. ESTEBETH.

39. As a direct and proximate result of Defendant's negligence, Plaintiff, **LEWIS MASOTTI**, suffered bodily injuries resulting in pain and suffering; physical and mental pain and anguish; disability; loss of capacity for the enjoyment of life; expense of hospitalization, surgery, and medications; expenses for physical and occupational therapy, and medical expenses. Plaintiff's losses are either permanent or continuing in nature and Plaintiff will suffer these losses into the future.

**WHEREFORE**, Plaintiff, **LEWIS MASOTTI**, demands judgment, interest and costs against Defendant, **ROYAL CARIBBEAN CRUISES, LTD** and any such other relief to which the Plaintiff may be justly entitled.

### COUNT 2: NEGLIGENCE (VICARIOUS LIABILITY OF RCCL BASED UPON APPARENT AGENCY)

40. Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs 1 through 31 as though originally stated herein.

41. The Defendant owed a duty the Plaintiff, LEWIS MASOTTI, to provide prompt and appropriate medical care upon his presentation to the ship's infirmary on May 23, 2018.

42. The Defendant, RCCL, by and through the acts of its employees or agents, including medical personnel, was negligent, in one or more of the following ways:

    A. In failing to properly assess the condition of LEWIS MASOTTI;

    B. In failing to timely diagnose and appropriately treat LEWIS MASOTTI;

    C. In failing to order appropriate diagnostic tests to further assess the degree of injury;

    D. In failing to recognize and understand the significance of diagnostic testing, vital signs and blood chemistry results and to appreciate LEWIS MASOTTI's rapidly declining medical condition;

    E.    In failing to obtain consultations with appropriate specialists;

    F.    In failing to recognize signs of internal bleeding, infection, dehydration and to treat these conditions within the appropriate standard of care;

    G.    In failing to properly monitor the patient;

    H.    In failing to evacuate the patient from the vessel for further care in a timely manner;

    I.    In deviating from the standard of care for patients in LEWIS MASOTTI's circumstances.

43. At all times material, the Defendant, RCCL, represented its medical staff, including its doctors and nurses, as its apparent agents who work in RCCL's "medical centers" on the vessel. The Defendant, RCCL, promotes its medical staff and represents them as being their apparent agents through brochures, internet advertising, and communications to passengers on the vessel. That RCCL held out its staff, including DR. ESTEBETH, as being its employee.

44. Further, the cruise line holds out the ship's physicians and medical staff as the apparent agents of the cruise line. The Defendant through its actions and conduct represents to its cruise passengers including, but not limited to the Plaintiff herein, that the shipboard physicians and medical staff work for the benefit of the Defendant. These actions and conduct of the cruise line include but are not limited to the following:

    A.    The Defendant controls cruise line physicians attire, which includes, at times, a uniform with epaulettes and stripes similar to other crewmembers;

    B.    The Defendant cruise line offers physicians benefits including senior officer status, round-trip transportation from residence to the ship, uniforms, meals, private furnished cabins with refrigerators, telephones, computers with internet access, daily housekeeping services, and indemnification and health care;

    C.    The Defendant cruise line requires that the ship's physicians sail with the ship;

    D.    The Defendant cruise line provides the onboard Medical Center;

    E.    The Defendant cruise line allows and requires the ship's physicians to operate and provide services out of the ship's Medical Center which is provided by the cruise line and is equipped by the cruise line;

    F.    The Defendant cruise line charges the services of the medical center, which includes services of the ship's doctors and other medical staff and charges for the medical equipment and goods provided by the cruise line, to the passenger's "Sail and Sign" Account;

    G.    The ship's physicians represented themselves to passengers as employees of Defendant, RCCL;

    H.    The Defendant cruise line sets the hours and limits access to the area of the ship where passengers can receive medical services to the ship's Medical Center, which is staffed exclusively by shipboard medical personnel;

    I.    The Defendant publishes the Medical Center's daily office hours in its flyer distributed to all passengers onboard its ships; and

    J.    The Defendant cruise line requires the shipboard physicians and medical staff to be on call 24 hours to attend to passenger medical emergencies.

45. The ship's physician is considered to be an Officer on board the vessel and a member of the crew, and was introduced to the passengers as one of the ship's Officers.

46. The ship's doctors and the nurses were held out to the passengers by RCCL as members of the ship's crew.

47. The Defendant put the ship's physicians and nurses under the command of the ship's superior officers, including the Master of the ship.

48. The cruise line represents to immigration authorities that the physicians and nurses are members of the ship's crew.

49. Both the ship's doctors and nurses are permitted to eat with the ship's crew.

50. The ship's physicians and nurses provide services in the ship's "medical centers" and the Plaintiff had no alternative to going to the ship's medical center to be seen for his symptoms.

51. At the time of Plaintiff's illness, the Plaintiff was seen, examined and treated by the ship's nurses and/or physicians.

52. Based on the foregoing, the Plaintiff reasonably believed that the ship's nurses and doctors were acting as direct employees or actual agents on behalf of the Defendants, and was never given any reason to believe otherwise.

53. MR. MASOTTI relied to his detriment on his belief that the physicians and nurses were direct employees or actual agents of the Defendant in that MR. MASOTTI followed the advice of RCCL's nurse and/or physician who did not seek any further medical testing or evaluation after being dismissed from the Medical Center after being unable to self-catheter.

54. As a result of the Plaintiff's reliance upon the ship's medical staff, the Plaintiff was not properly treated and, in fact was mistreated, such that he became delirious, and that subsequent medical treatment and intervention was untimely, and he developed sepsis, resulting in cognitive impairment and injury

55. That the Defendant is liable to the Plaintiff for any and all damages as a result of negligent medical care by the physician and/or nurse under the theory of apparent agency.

**WHEREFORE**, Plaintiff, **LEWIS MASOTTI**, demands judgment, interest and costs against Defendant, **ROYAL CARIBBEAN CRUISES, LTD** and any such other relief to which the Plaintiff may be justly entitled.

### COUNT 3 - LOSS OF CONSORTIUM OF JUDITH E. MASOTTI

56. Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs 1 through 31 as though originally stated herein.

57. In *American Export*, the Supreme Court held that loss of consortium was recoverable for personal injury under General Maritime Law understanding that "it is a settled canon of maritime jurisprudence that 'it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rules.'" *American Export Lines, Inc. v. Alvez*, 446 U.S. 274, 281-282 (1980).[1]

58. In *Atlantic Sounding Co. v. Townsend*, the Supreme Court held that punitive damages are recoverable under General Maritime Law, for claims of maintenance and cure, and rejected the broad interpretation in *Miles v. Apex Marine*, 498 U.S. 19 (1990) (holding that "there is no recovery for loss of society under general maritime action for *wrongful death* of a Jones Act Seaman." (emphasis added))

59. Plaintiff acknowledges that, recently, in an unpublished and non-binding opinion, the Eleventh Circuit upheld the lower Court's granting of a Motion for Summary Judgment[2]

---

[1] Citing *Morgane v. States Marine Lines*, supra at 398 U. S. 387, quoting, with approval, The Sea Gull, 21 F.Cas. 909, 910 (No. 12,578) (CC Md. 1865).
[2] The Eleventh Circuit reversed the General Negligence count and remanded the case.

ruling that loss of consortium is not recoverable for personal injury under General Maritime Law.[3] *Petersen v. NCL(Bahamas) Ltd.*, No. 17-15581, 2018 WL 4214239, at *4 (11th Cir. Sept. 5, 2018).[4] However, this is an unsettled area of law considering the Supreme Court's holding in *Atlantic Sounding*, 557 U.S. 404, and the pending decision in *Batterton v. Dutra Group*, 880 F. 3d. 1089 (9th Cir. 2018).[5] Therefore, Plaintiff is entitled to all remedies at law for a ***personal injury*** action.

60. As a direct, proximate and foreseeable result of the negligence and actions of the Defendant, **ROYAL CARIBBEAN CRUISES, LTD**, as alleged, the Plaintiff, **JUDITH E. MASOTTI**, suffered in the past and will continue to suffer in the future the loss of her husband's companionship, society, consortium, affections, attentions and services and, has in the past and will in the future incur medical and related expenses for her husband's care and treatment.

61. These losses are either permanent or continuing and the Plaintiff, **JUDITH E. MASOTTI,** will suffer those losses in the future.

**WHEREFORE**, Plaintiffs, **LEWIS MASOTTI** and **JUDITH E. MASOTTI**, demand judgment, interest and costs against Defendant, **ROYAL CARIBBEAN CRUISES, LTD**, and any such other relief to which the Plaintiff may be justly entitled.

Dated: May 22, 2019.

---

[3] The Court relied its holding in *In Re Amtrak Sunset Ltd. Train Crash in Bayou Carnot*, Ala. On Sept. 22, 1993, 121 F.3d 1421, 1429 (11th Circuit 1997).
[4] The Eleventh Circuit relied on *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990), which *Atlantic Sounding* suggests should not be so broadly construed.
[5] The Supreme Court heard oral arguments in *Batterton* on March 24, 2019 and the session will close on June 24, 2019.

HOLZBERG LEGAL
Offices at Pinecrest II, Suite 220
7685 S.W. 104th Street
Miami, Florida 33156
Telephone: (305) 668-6410
Facsimile : (305) 667-6161


BY:     */s/Glenn J. Holzberg*
        GLENN J. HOLZBERG
        Fla. Bar # 369551